OPINION OF THE COURT
Alexander, J.
In the circumstances of this case, the private communication between the arbitrator and one party-litigant, which *228 related to the credibility of the party-litigant and the validity of the amount in dispute, and occurred without the knowledge or consent of the other party-litigant, constitutes misconduct sufficient to warrant vacating the arbitration award (CPLR 7511 [b] [1] [i]).
I.
In 1981, Abraham Goldfinger and Leo Lisker, both members of a trade organization called the Diamond Dealers Club (DDC), became embroiled in a controversy involving diamond transactions. Pursuant to the DDC bylaws,[1] both agreed to submit their dispute to a three-member panel of DDC arbitrators, and the matter proceeded to arbitration in accordance with the DDC bylaws and CPLR article 75. Goldfinger claimed that Lisker owed him $500,000 as the result of a joint venture, while Lisker denied the existence of any such partnership or obligation. After a hearing spanning five months, the arbitrators awarded Goldfinger $162,976. Thereafter, Goldfinger commenced this proceeding in Supreme Court to confirm the award (CPLR 7510); Lisker cross-moved to vacate, alleging various instances of arbitrator misconduct.[2] By order, affirmed on appeal (Matter of Goldfinger, 92 AD2d 756), Special Term referred the matter to a Referee, who, after a hearing on the allegations of misconduct, recommended that the motion to confirm be granted and the cross motion to vacate be denied, concluding that Lisker had failed to sustain his burden of proving misconduct by clear and convincing evidence. Special Term adopted the Referee’s findings and conclusions and confirmed the arbitration award. The Appellate Division affirmed (Matter of Goldfinger v Lisker, 111 AD2d 602), and the matter is before us by leave of this court (67 NY2d 601). For the reasons that follow, we now reverse.
*229 The Referee found that the arbitrators had engaged in several private communications, two of which — one involving Weinman, the chairman of the arbitration panel, and Horowitz, a third party, and another involving Weinman and Goldfinger, a party to the proceeding — we deem critical. Horowitz was a member of the DDC and one of Lisker’s business associates, but also was known to Goldfinger. The Referee found that during the pendency of the arbitration, Horowitz and Goldfinger engaged in a conversation in which Goldfinger, referring to Lisker, stated "he could have settled it for $70,000 * * * now it will cost him three times the amount”, and that Horowitz subsequently repeated these statements to Weinman,[3] who called one of his fellow arbitrators to relay the story. Both arbitrators, without consulting the third on the panel, decided that Horowitz would not have to testify at the arbitration to his conversation with Goldfinger because the panel had already heard testimony concerning the settlement disputes and Horowitz’s testimony would be cumulative.
Thereafter, Weinman, on his own initiative, and without the knowledge or consent of Lisker or the other arbitrators, engaged Goldfinger in conversation in an attempt "to force Mr. Goldfinger to break down and change his story”, and "to break Goldfinger down from his original claim” of $500,000, on the assumption that if Goldfinger in fact had refused a $70,000 settlement offer from Lisker, then Goldfinger would not "break down”. According to Weinman, Goldfinger remained steadfast, handling himself in Weinman’s words "to my satisfaction”. The Referee concluded that the communications between Weinman, Horowitz and Goldfinger, although they concerned the pendency of the hearing, did not concern the subject matter of the underlying dispute and therefore did not rise to the level of misconduct.
Lisker argues that Weinman pursued a private conversation with Goldfinger in part to test Goldfinger’s credibility and in part to evaluate the amount of Goldfinger’s claim in view of the conflicting evidence about who offered to settle the case with whom. Lisker maintains that the Referee erred in concluding that credibility of a party is not central to the su]b *230 stance of the dispute, arguing that when an arbitrator privately discusses a case with a litigant, the prejudice stems as much from the private access itself as from the substance of what was said between them. He therefore urges the adoption of a per se rule that private communications between an arbitrator and a party-litigant constitute misconduct. Gold-finger argues that in order to constitute misconduct sufficient to warrant vacating an arbitration award, such communications must result in prejudice to the complaining party and because the Referee found that Weinman’s conversations with Horowitz, and with Goldfinger did not result in any prejudice to Lisker, the award should be confirmed. Additionally, Gold-finger argues that any conversations between the arbitrators and third parties were authorized by the DDC bylaws.[4]
II.
Our State has long sanctioned arbitration as an effective alternative method of settling disputes (CPLR art 75; Civ Prac Act art 84; Code Civ Pro, ch XVII, tit VIII; Rev Stat of NY, part III, ch VIII, tit XIV [1829]). Those engaged in commercial affairs have routinely resorted to arbitration for an expeditious resolution of their disputes by persons with a practical knowledge of the subject area (Matter of Siegel [Lewis], 40 NY2d 687, 689; Matter of Webster v Van Allen, 217 App Div 219, 221), and as long as arbitrators act within their jurisdiction, their awards will not be set aside because they have erred in judgment either upon the facts or the law (CPLR 7501; Matter of Silverman [Benmor Coats], 61 NY2d 299; Matter of Associated Teachers v Board of Educ., 33 NY2d 229; Fudickar v Guardian Mut. Life Ins. Co., 62 NY 392, 400). Courts are reluctant to disturb the decisions of arbitrators lest the value of this method of resolving controversies be undermined (Matter of Siegel [Lewis], 40 NY2d, at p 689, supra; Fudickar v Guardian Mut. Life Ins. Co., 62 NY, at p 400, supra). Precisely because arbitration awards are subject to such judicial deference, it is imperative that the integrity of the process, as opposed to the correctness of the individual decision, be zealously safeguarded.
Arbitration by its nature contemplates a less formal environment than the judicial forum (see, Matter of Silverman *231 [Benmor Coats], 61 NY2d, at p 308, supra; see also, Bernhardt v Polygraphic Co., 350 US 198, 203 & n 4), and accordingly, arbitrators are not held to the standards prescribed for members of the judiciary.[5] Nevertheless, arbitrators must take a formal oath (CPLR 7506 [a]), are expected to "faithfully and fairly” hear the controversy over which they have been chosen to preside (CPLR 7506 [a]; Matter of Siegel [Lewis], 40 NY2d, at p 689, supra) and ought to conduct themselves in such a manner as to safeguard the integrity of the arbitration process. Arbitrators must afford the parties the opportunity to present evidence and to cross-examine witnesses (CPLR 7506 [c]) and may act only upon proof adduced at a hearing of which due notice has been given to each party (CPLR 7506 [b], [c]; Matter of Delmar Box Co. [Aetna Ins. Co.], 309 NY 60, 64; Matter of Penn Cent. Corp. [Consolidated Rail Corp.], 56 NY2d 120, 127). They may not predicate their award on the strength of independent investigation unless so authorized by the parties (Berizzi Co. v Krausz, 239 NY 315, 318).
Although courts generally will not interfere with the judgment of arbitrators, arbitration awards are not to be confirmed without question where there is evidence of misconduct prejudicing the rights of the parties. CPLR 7511 provides in pertinent part that an arbitration award shall be vacated if the court finds that the rights of the complaining party were prejudiced by corruption, fraud, or misconduct in procuring the award (see generally, Rothstein, Vacation of Awards for Fraud, Bias, Misconduct and Partiality, 10 Vand L Rev 813). While arbitrators often are chosen because of their expertise in a particular area (Matter of Siegel [Lewis], 40 NY2d, at p 690, supra; 8 Weinstein-Korn-Miller, NY Civ Prac [J 7506.18) and are generally permitted independent recourse to third-party sources when necessary to confirm technical information (Matter of Gerli & Co. v Heineman Corp., 258 NY 484, 488; Matter of A. M. Pearlman, Inc. [Raycrest Mills], 280 App Div 744, 749) or to further focus their expertise on a particular point, for an arbitrator to privately consult a party-litigant without the knowledge or consent of the other party to the proceeding raises serious concerns as to whether the award was procured by improper means.
*232 In Berizzi Co. v Krausz (239 NY 315, supra), the arbitrator investigated the salability of certain skewers which were the subject matter of a contract dispute, after the hearings had been closed and without notice to the parties. The arbitrator conceded that the award was made on the strength of this personal investigation as well as upon the testimony submitted at the hearing. We vacated the award and held that the independent investigation constituted misconduct because the plaintiff knew nothing of the investigation and therefore had no opportunity to rebut what the arbitrator had been able to learn. We did not adopt a per se rule, however, such as that now urged by Lisker; rather we acknowledged that certain independent investigations such as those "directed toward facts of trifling importance or facts of such a nature as to preclude reasonable contest” and those conducted with the knowledge or consent of the parties would not require invalidation of the award (239 NY, at p 320, supra).
While the bylaws of the DDC authorize arbitrators to "investigate the facts charged in the complaint”, it does not follow that the bylaws sanction the kind of private communications that occurred between Weinman and Goldfinger and Horowitz.[6] Weinman’s communication with Goldfinger following the conversation with Horowitz was deliberate in nature and designed clearly to enable Weinman to resolve in his own mind any doubt he may have had as to Goldfinger’s credibility or the validity of the claim itself. In so contacting Goldfinger, Weinman denied Lisker the opportunity to respond and created the appearance of impropriety if not actual partiality. Such actions amounted to misconduct which prejudiced Lisker’s rights under CPLR 7506 (a), (b) and (c). Furthermore, the fact that Weinman initiated the contact with the goal of testing whether he could break Goldfinger down from his original claim hardly permits characterizing the inquiry as one directed toward "facts of trifling importance” or "facts of such a nature as to preclude reasonable contest”. Indeed, the record demonstrates the importance attached by the arbitrator to the substance and specifics of the alleged settlement offers. Our general reluctance to disturb arbitration awards must yield in this case to the clear necessity of safeguarding *233 the integrity of the arbitration process (cf. Matter of Associated Teachers v Board of Educ., 33 NY2d 229, supra).
For the foregoing reasons, the order of the Appellate Division should be reversed, the motion to confirm the award denied, and the cross motion to vacate the award granted. Chief Judge Wachtler and Judges Meyer, Simons, Kaye, Titone and Hancock, Jr., concur.
Order reversed, with costs, motion to confirm the arbitration award denied, and motion to vacate the award granted.

. Article XII, § 1 (a) of the DDC bylaws provides in pertinent part that "[a]ny member having any claim arising out of or related to the diamond business * * * must submit to adjudication by the tribunals of Diamond Dealers Club”.

. In his cross motion to vacate the award, and in his brief to this court, Lisker alleges that the arbitrators were guilty of misconduct by engaging in private communications with Goldfinger, a party-litigant; by engaging in communications with various third parties in the absence of the party-litigants; by refusing to allow Lisker to present certain witnesses on the ground that they were his relatives or employees; by refusing to allow Lisker to transcribe the proceedings; and by allegedly violating the DDC bylaws by disregarding the applicable Statute of Limitations. We find the claim regarding the private communications to be dispositive and therefore need not consider the others.

. It is not clear from the record who approached whom. According to Goldfinger, Horowitz approached Weinman with the story as part of a plan orchestrated by Lisker himself. At the hearing before the Referee, Horowitz testified that Weinman and he found themselves coincidentally in an office they both frequented, and Weinman began talking about the difficulties of the arbitration which led to the complained of communication.

. Article XII, § 12 (a) of the DDC bylaws provides in pertinent part that the "Arbitration Committee, acting in each case, shall have the authority and power to investigate the facts charged in the complaint”.

. See, Matter of Siegel (Lewis), 40 NY2d 687; see, e.g., Code of Judicial Conduct, canon 3, which provides that a Judge should neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.

. It is instructive to note that in the news journal of the DDC for January 1982, the month following the month in which this award was issued, the chairman of the board of the DDC wrote an article condemning the kind of communications under consideration here as having the potential for distorting the impartiality of the arbitrator.