UNITED HOUSE OF PRAYER FOR ALL PEOPLE OF the CHURCH ON THE ROCK OF the APOSTOLIC FAITH, Petitioner,

v.

L.M.A. INTERNATIONAL, LTD., Respondent.

No. 99 Civ. 4545(RMB).

United States District Court, S.D. New York.

June 22, 2000.

Edward F. Maluf, Piper & Marbury LLP, New York City, NY, for petitioner.

Robert Banner, Berman, Paley, Goldstein & Kennry, LLP, New York City, NY, for respondent.

### ORDER

BERMAN, District Judge.

Petitioner United House of Prayer for All People of the Church on the Rock of the Apostolic Faith ("Petitioner" or "Church" or "United") moves pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9 ("FAA"), for an order confirming a Construction Industry Arbitration Award ("Award") issued on June 7, 1999. Under the Award, Respondent L.M.A. International, Ltd. ("Respondent" or "LMA") was directed to pay a total of $2,596,295.26 plus $519.83 [1] interest per day to United. Respondent opposes confirmation of the Award, and is understood by this Court to cross-move to vacate the Award pursuant to Section 10 of the FAA. 9 U.S.C. § 10; *see The Hartbridge*, 57 F.2d 672 (2d Cir.

---

1. As calculated on page 230, *infra*.

1932) ("Upon a motion to confirm the party opposing confirmation may apparently object upon any ground which constitutes a sufficient cause under the statute to vacate, modify, or correct, although no such formal motion has been made."). The Award was made by a panel of three arbitrators from the American Arbitration Association ("AAA"). **For the reasons set forth below, the motion to confirm the Award is granted, and the cross-motion to vacate the Award is denied.**

### Background

Petitioner United, a non-profit church incorporated in the District of Columbia and owner of property located at 2310 Eighth Avenue, New York, New York 10027, and Respondent LMA, a New York construction services company, entered into an agreement on July 10, 1996 (the "Agreement") to undertake certain repair and other construction work at the 2310 Eighth Avenue property. Disputes arose between the Church and LMA with respect to the project, and on June 12, 1996, under the Agreement's arbitration clause[2], LMA filed for arbitration by (the New York City office of) the AAA. LMA demanded monies for work allegedly performed under the Agreement. United counterclaimed for monies for management fees, repair of defective work, payments to subcontractors, completion costs and overpayments to LMA.

Shortly after the arbitration was commenced, both parties signed a Compensation Stipulation, dated September 24, 1996, providing for payment of the arbitrators' fees at a rate of $1,000 per arbitrator per day; an arbitration-day lasted from approximately 10:00 AM to 4:00 PM. Affidavit of Gregory E. Ronan, dated September 9, 1999 ("Ronan Aff.") ¶ 8. By the summer of 1997, only ten hearing-days had been completed due to the difficulty of coordinating the arbitrators' schedules. Counsel for LMA apparently complained to the

AAA case administrator about the slow pace of the arbitration. Shortly thereafter, the arbitration panel agreed to extend the length of the hearing days, i.e., from 8:30 AM to 5:30 PM. The arbitrators pay was increased by 50%, in accordance with the 50% (longer) arbitration days. Both parties consented to the increase. Affidavit of James T. Farrell, dated September 9, 1999 ("Farrell Aff.") ¶ 5.

Sometime during the next few hearings, counsel for LMA advised the panel that LMA was in serious financial difficulties; that LMA was having trouble getting expert witness to appear due to lack of funds; and that LMA itself had ceased business operation because it had no money to pay rent or salaries. Ronan Aff. ¶ 12.

In June of 1997, the AAA sent out an (advance) invoice for hearings to be held in September and October, 1997. On September 17, 1997, the AAA informed the parties that it would suspend arbitration because Respondent's share of arbitration fees had not been paid. Farrell Aff. ¶ 7; Farrell Aff. Exhibits C and D. Petitioner, not wanting to initiate a new proceeding, offered to advance Respondent's portion of the arbitrators' fees, and, therefore, the AAA resumed hearings. LMA wrote, in a letter to the AAA dated April 7, 1998, "The Respondent has stated that it has paid all fees due for the arbitration. We expect that they will continue to pay all fees so that there will be no further interruption of the hearings. Under these circumstances, we request that the Association immediately schedule hearings on the claims and counterclaims." Reply Affidavit of Edward F. Maluf, dated September 22, 1999 ("Maluf Reply Aff.") ¶ 4; Maluf Reply Aff. Exhibit A.

After more than twenty arbitration sessions, the panel issued its Award, effective June 7, 1999, providing that LMA pay to

---

**2.** The AAA had jurisdiction to hear and adjudicate the demand and counterclaim between the parties pursuant to § 4.5.1 of the Agreement, and neither party challenged AAA jurisdiction.

the Church the sum of $2,566,727.41, plus interest thereon at the rate of $519.83 per day from and after June 7, 1999. Affidavit of Edward F. Maluf, dated June 22, 1999 (Maluf Aff.) Exhibit C. The amount of the Award was allocated as follows:

a) $233,230.00 to LMA on its claims;

b) $2,341,425.00 to the Church on its counterclaims for management fees, repair of defective work, direct payment to subcontractors, excess completion costs and overpayments; and

c) $458,532.41 to the Church as interest for 29 months (preceding the award) at nine percent (9%) per annum.

In addition, the Church was awarded an additional $29,567.85 determined as follows:

a) $27,620.25, representing that portion of the AAA's fees previously advanced by the Church but attributable to LMA;

b) $2,307.60 representing that portion of the AAA's fees and expenses previously advanced by the Church but attributable to LMA.

The motion before the Court raises four issues: (i) whether N.Y.C.P.L.R. ("CPLR") 7511 or the FAA, 9 U.S.C.A. § 9 (1970), governs review of the instant motion; (ii) whether *ex parte* communications with the arbitrators, alleged by LMA to have occurred, serve as grounds to vacate the Award; and (iii) whether the increase in the arbitrators' fees serve as grounds to vacate the Award.

### Analysis

### I. Standard of Review

Respondent urges the Court to apply CPLR 7511 instead of § 9 of the FAA in analyzing the instant motion and cross-motion. Petitioner, on the other hand, asserts that the FAA governs because interstate commerce was evidenced in the instant transaction. While the standards for vacatur of an arbitrator's award are similar under both statutes, courts often hold that the "appearance of impropriety" may not be sufficient to vacate an award

under the FAA, while under CPLR 7511(b), as construed by the New York courts, the appearance of impropriety may be a sufficient or critical factor in vacating arbitration awards. See *J.P. Stevens & Co., Inc. v. Rytex Corporation*, 34 N.Y.2d 123, 126, 356 N.Y.S.2d 278, 312 N.E.2d 466 (1974), *aff'd* 34 N.Y.2d 123, 356 N.Y.S.2d 278, 312 N.E.2d 466 ("[A]n arbitration tribunal must not only be unbiased, but must also avoid even the slightest appearance of bias."); *compare New York Newspaper Printing Pressman's Union No. 2 v. The New York Times Company*, 1992 WL 122788 (S.D.N.Y.) ("Federal law requires a showing of prejudice.").

The FAA governs—to the exclusion of state law—whenever the matter involved is a maritime transaction or one involving interstate or foreign commerce. 9 U.S.C.A. § 9. That is the case here. While Respondent argues that there was "virtually no interstate connection during construction or once the project [was] completed," Petitioner has demonstrated that, among other things, there were subcontractors from outside New York who either came to New York to work on the job, or supplied materials that were delivered to the job site. Petitioner has also provided documentation that a large stained glass window that was installed in the Church building came from Pennsylvania, and that the Church kitchen was purchased from a Connecticut subcontractor. Maluf Reply Aff. Exhibits B and C. Respondent concedes that those construction cases which find an interstate commerce connection often involve movement of goods, materials and workers across state lines, as occurred here. See, e.g., *Sears Roebuck & Co. v. Glenwal Company*, 325 F.Supp. 86 (S.D.N.Y.1970). (contract for building of shopping center involved interstate commerce when laborers traveled from New Jersey to New York job site.). Thus, the instant case certainly can be said to entail "interstate commerce."

Respondent invokes *Evangeline Telephone Co., Inc. v. AT & T Communica-*

*tions of South Central States, Inc.,* 916 F.Supp. 598 (W.D.La.1995) to argue that Petitioner was required to allege in its petition that the transaction involved interstate commerce. *Evangeline* does not stand for this proposition.[3]

■ The holding in *Evangeline* is limited to the resolution of a motion to dismiss. The Court's statement that the FAA requires that the arbitration agreement involve interstate commerce is the relevant standard. The instant motion involves confirmation of an arbitration award, and, therefore, the Court may review evidence beyond the pleadings—as both parties have clearly acknowledged by their submissions—to determine whether interstate commerce was involved.

Second, most courts today determine that the existence of interstate commerce is an evidentiary matter. *See, e.g., KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.,* 184 F.3d 42 (1st Cir.1999) ("the contracts to which the statute applies implicate interstate commerce, thus subjecting them to the reach of the FAA."); *Ruby–Collins, Inc. v. City of Huntsville, Alabama,* 748 F.2d 573 (11th Cir.1984) (allowing an evidentiary hearing to establish the existence of the "interstate nexus" required by the FAA); *C.P. Robinson Construction Company v. National Corp. for Housing Partnerships,* 375 F.Supp. 446, 451 (M.D.N.C.1974) (Setting forth the criteria for a transaction in commerce, including, in general, trade between citizens of the several states and in particular, "purchases of large quantities of building materials and fixtures from out-of-state suppliers."). *See also Starr Elec. Co. v. Basic Constr. Co.,* 586 F.Supp. 964, 965–66 (M.D.N.C.1982) ("[T]he Court must decide first whether the subcontract

between Starr and Basic evidences a transaction in "commerce," within the meaning of 9 U.S.C. § 1"); *Pennsylvania Eng'g Corp. v. Islip Resource Recovery Agency,* 710 F.Supp. 456, 460 (E.D.N.Y. 1989) ("A contractual arbitration agreement is subject to the Federal Arbitration Act if the contract 'evidenc[es] a transaction involving' interstate or maritime commerce. 9 U.S.C. § 2. The contract in this case involves a multi-million dollar construction project to be built on Long Island by a Delaware corporation which involves engineers, contractors, supplies, etc. from many states. Thus, the construction of the Facility affects interstate commerce"). Indeed, in *Starr,* the Court found the plaintiff's production of "an affidavit listing over forty purchase orders for building supplies from out-of-state suppliers that were used on the building" to be a sufficient showing of the interstate nexus. Purchase orders, similar to those in *Starr,* have been affixed to Petitioner's affidavits in this case. *See* Maluf Reply Aff. Exhibits B and C.

Third, it is at least arguable that Petitioner did allege interstate commerce in the petition. The Agreement, attached to the petition, clearly reflects that the disputed transaction took place among the Church (located in Washington, D.C.), the contractor (located in New York), and an architect (located in Connecticut).

■ The basis of this Court's review of an arbitration award under § 9 of the FAA is (appropriately) limited. *See In re Arbitration Between Carina International Shipping Corp. and Adam Maritime,* 961 F.Supp. 559, 563 (S.D.N.Y., 1997); *Americas Insurance Co. v. Seagull Compania Naviera, S.A.,* 774 F.2d 64, 67 (2d Cir.

---

**3.** The Court in *Evangeline* noted that:

    The threshold requirement of the FAA is that the arbitration agreement at issue involved interstate commerce; review of such an arbitration is strictly limited by the [FAA]. *See* §§ 2, 10.

    As indicated above, a motion to dismiss is to be weighed solely on the allegations of

the complaint, or in this case the appeal and motion filed by the plaintiff. Nowhere in the initial pleading does plaintiff allege that the arbitration agreement involved interstate commerce. Without such an allegation the Court can not find that the FAA applies to this dispute.

1985) (scope of review of arbitration award is "very narrowly limited"); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."); *Cedrela Transport Ltd. v. Banque Cantonale Vaudoise*, 67 F.Supp.2d 353, 354 (S.D.N.Y.1999) ("The Federal Arbitration Act embodies 'a liberal national policy favoring arbitration agreements.'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).. Vacatur of an arbitration award is permissible only when an arbitrator has shown a "manifest disregard of the law." *See e.g., W.K. Webster & Co. v. American President Lines*, 32 F.3d 665, 669 (2d Cir.1994). Manifest disregard of the law, in turn, requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.... Neither the erroneous application of the rules of law, nor the arbitrator's erroneous decision of the facts is ground for vacating the award." *See Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892–93 (2d Cir.1985). Manifest disregard may be found only where an arbitrator "understood and correctly stated the law but proceeded to ignore it." *See id.* at 893. Also, a Federal court may not upset the factual determinations of an arbitration panel on a confirmation motion. *See United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("[A] court may not reject an arbitrator's factual findings simply because the court disagrees with them."). There is no showing of "manifest disregard" in this case, nor is any alleged.

▆▆▆ Indeed, LMA does not (explicitly) contest the findings of the arbitrators. Rather, LMA alleges that certain *ex parte* communications between the arbitrators and the Church, and certain arrangements for paying the panel's fees, tainted the integrity of the proceedings. The burden is on the Respondent to demonstrate "actual prejudice." *See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997) ("The showing required to avoid summary confirmation of an arbitration award is high, and a party moving to vacate that award has the burden of proof."); *New York Newspaper Printing Pressman's Union No. 2 v. The New York Times Company*, 1992 WL 122788 at *6 (S.D.N.Y.) (With respect to both *ex parte* communications and raising of arbitrator's fees, "to establish prejudice, there must be a causal connection between the arbitrator's conduct and the award adverse to the Union's interest."). Actual prejudice is misconduct that amounts to a "denial of the fundamental fairness of the arbitration proceeding." *Roche v. Local 32B–32J Service Employees Int'l Union*, 755 F.Supp. 622, 624 (S.D.N.Y.1991) (quoting *Transit Cas. Co. v. Trenwick Reinsurance Co., Ltd.*, 659 F.Supp. 1346, 1354 (S.D.N.Y.1987)). Actual prejudice has not been shown here.

## II.   (Alleged) Ex Parte Communications

Respondent alleges that a faxed letter, dated September 17, 1997, from the AAA to LMA, "advised [LMA] that in [LMA's] absence the arbitrators had conducted a conference call with the petitioner's attorneys to discuss the question of payment of the arbitrators' fees." Respondent argues that such ex parte communications are grounds for vacating the Award, and cites *In re Arbitration Between Catalyst Waste–To–Energy Corporation of Long Beach and City of Long Beach*, 164 A.D.2d 817, 560 N.Y.S.2d 22 (1st Dep't 1990), *app. dismissed without opinion* 76 N.Y.2d 1017, 565 N.Y.S.2d 766, 566 N.E.2d 1171 (1990) ("Further, the ex parte communications between the parties and the arbitrators violated AAA rules forbidding such direct contacts and warranted vacatur of the award") (citing *Matter of Goldfinger v. Lisker*, 68 N.Y.2d 225, 508 N.Y.S.2d 159, 500 N.E.2d 857 (1986)).   Petitioner re-

sponds that no *ex parte* communications took place.

■ Although improper ex parte communications may provide grounds for vacating an arbitration award, see *Matter of Goldfinger v. Lisker*, 68 N.Y.2d 225, 508 N.Y.S.2d 159, 500 N.E.2d 857, it has not been shown that improper *ex parte* communications took place here. Petitioner argues that "the so-called ex parte communication was a conference call arranged by the AAA among all counsel and the panel. When Mr. Ronan [Respondent's attorney] failed to join the call, the panel and the Church's counsel disconnected. The panel and the Church's counsel merely exchanged pleasantries, and nothing more, while waiting for Mr. Ronan to join the call." In fact, the letter from the AAA to LMA, dated September 17, 1997, attached to Respondent's affidavit, makes no reference to a conference call.

The Court finds that LMA has not shown that any improper *ex parte* communications took place.

### III. *Change in Arbitrators' Fee*

■ Respondent LMA asserts that the arbitrators raised their fees in the middle of the arbitration, forcing LMA to consent to the new rate or risk retaliation or bias from the panel. Petitioner counters that the arbitrators' rate was never in fact

raised. The Court agrees that the arbitrators' fees were not raised. Rather, the arbitrators agreed to sit for longer hearing-days, thereby causing their (overall) daily rate to raise, while their hourly rate remained constant (also necessitating fewer hearing-days overall). In response to Respondent's own demands, the AAA panel agreed to sit from 8:30 AM to 5:30 PM, rather than from 10:00 AM to 4:00 PM, to speed the pace of arbitration. In extending their days by 50%, they also extended their daily rate by 50%. This change resulted in no greater total arbitration fees.[4]

■ The instant case is distinguishable from the cases cited by Respondent, all of which involved an actual increase in the rate of compensation. *See New York Newspaper Printing Pressman's Union No. 2 v. The New York Times Company*, 1992 WL 122788 (S.D.N.Y.); *Gauthier v. Mardi Capital Corporation*, 1990 WL 170369 (S.D.N.Y.1990); *Grendi v. LNL Const. Management Corp.*, 175 A.D.2d 775, 573 N.Y.S.2d 515 (1st Dep't 1991); *In re Arbitration Between Catalyst Waste–To–Energy Corporation of Long Beach and City of Long Beach*, 164 A.D.2d 817, 560 N.Y.S.2d 22 (1st Dep't 1990), *app. dismissed without opinion* 76 N.Y.2d 1017, 565 N.Y.S.2d 766, 566 N.E.2d 1171 (1990); and *Goldfinger v. Lisker*, 68 N.Y.2d 225, 508 N.Y.S.2d 159, 500 N.E.2d 857 (1986).[5]

---

4. Although LMA alleges that the panel charged as much as $2,000 per day, this is not borne out by their submissions. In the AAA's invoice under June 16, 1997, for example—one of the dates cited by LMA as being problematic—LMA was billed at the same hourly rate as on shorter days. The arbitrators charged $13,500 to LMA (in their advance invoice) for "arbitrator's compensation" for nine hearings. Nine hearings, times 3 arbitrators, times $1,000 per day comes to $27,000, of which LMA paid half, or $13,500. In addition, LMA was billed $4,500 for "arbitrator's compensation for ½ extra days" for six (of those) days. Six hearings, times 3 arbitrators, times $500 per day comes to $9,000, of which LMA paid half, or $4,500. The arbitrators charges $1,500 for each extended hearing-day.

5. LMA may also be said to have waived any bias objections. LMA had the right to complain at once to the AAA Tribunal Administrator as soon as LMA determined there may have been *ex parte* communication and/or when LMA felt aggrieved by a purported raise in arbitration fees during the proceedings. LMA chose not to exercise its rights.
"If a party goes forward with arbitration, having actual knowledge of the arbitrator's bias, or of facts that reasonably should have prompted further, limited inquiry, it may not later claim bias...." *J.P. Stevens & Co.*, 34 N.Y.2d at 130, 356 N.Y.S.2d 278, 312 N.E.2d 466. *See also In the Matter of Sterling Cheek v. Chubb & Son, Inc.*, 70 A.D.2d 622, 416 N.Y.S.2d 313 (2d Dep't 1979) and cases cited. "The party who disregards an available remedy and waits to see how the award comes out cannot justifiably make that claim." *New*

### Conclusion

For the reasons stated above, the Court grants Petitioner's motion to confirm the Award and denies Respondent's cross-motion to vacate the Award. The clerk is respectfully requested to enter judgment in favor of the Petitioner in the amount of $2,596,295.26 plus $519.83 interest per day from and after June 7, 1999.