57th & 6th Ground LLC v Carnegie House Tenants Corp. (2026 NY Slip Op 50003(U))

[*1]

57th & 6th Ground LLC v Carnegie House Tenants Corp.

2026 NY Slip Op 50003(U)

Decided on January 5, 2026

Supreme Court, New York County

Moyne, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 5, 2026
Supreme Court, New York County

57th & 6th Ground LLC, Petitioner,

againstCarnegie House Tenants Corporation, Georgetown 57, LLC, Respondent.

Index No. 654326/2025

Stephen B. Meister (Meister Seelig & Fein PLLC), Jonathan Lippman (Latham & Watkins LLP) for the Petitioner (Landlord); and Hon. David B. Saxe (Morrison Cohen LLP), Gayle Pollack (Morrison Cohen LLP), Brett Dockwell (Haynes and Boone, LLP), and Joshua E. Hollander (Loeb & Loeb, LLP) for the Respondents (Tenant)

Nicholas W. Moyne, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 9, 19, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 105, 106, 107, 108, 109, 110, 111, 112, 115 were read on this motion to/for CONFIRM/DISAPPROVE AWARD/REPORT.
Upon the foregoing documents, it isThe petitioner, 57th & 6th Ground LLC (the "Landlord"), moves, pursuant to CPLR § 7510, to confirm an arbitration award (the "Final Award"). The respondents, Carnegie House Tenants Corporation and Georgetown 57, LLC (collectively, the "Tenant" or "Coop"), cross-move, pursuant to CPLR § 7511(b)(1)(i) and (ii), to vacate the Final Award based on claims of arbitrator partiality and misconduct in procuring the award.
For the reasons set forth in further detail below, upon review of the voluminous record which includes the parties' affirmations, memoranda of law, and exhibits, as well as having heard oral argument, the Court finds that the Tenant has failed to meet the very heavy burden of proof required under CPLR Article 75 to demonstrate that its rights were prejudiced by the alleged partiality and misconduct of the neutral umpire. While the conduct surrounding the neutral umpire's acceptance and later refusal of an unrelated engagement offered by Landlord's counsel [*2]created an appearance of impropriety, this conduct, when assessed against the stringent standards of CPLR Article 75, does not constitute the corruption, fraud, misconduct, or partiality necessary to justify the extreme remedy of vacating a final arbitral award. Crucially, the Tenant failed to meet its heavy burden of demonstrating clear and convincing evidence of partiality that resulted in prejudice. Furthermore, the Tenant's argument is severely undermined by the fact that its own party-appointed arbitrator, Howard Raber, signed the unanimous Final Award, a document Raber later attempted to impeach by affidavit, Accordingly, the petition to confirm the Final Award should be and is granted and the cross-motion to vacate the Final Award is denied.
FACTUAL BACKGROUND AND FINDINGS OF FACT
A. The Arbitration Proceeding and Process
The underlying dispute concerns a ground rent reset for the property located at 100 West 57th Street, New York, New York, pursuant to an Agreement of Lease dated December 16, 1959, as amended (the "Lease"). The Lease provides that the annual net rent is to be calculated as 8.1667% of the fair market value of the demised land, "considered as if vacant, unimproved, and free of the Lease" (emphasis added).[FN1]
The Lease further provides that any dispute over the ground rent reset was subject to mandatory arbitration, to be completed pursuant to the process or procedure outlined under the Lease. The Lease stipulated that the arbitration would be conducted in accordance with Article 84 of the Civil Practice Act (the predecessor to CPLR Article 75).[FN2]
The arbitration proceeding was conducted by a tripartite panel, consisting of the two party-appointed arbitrators, Howard Raber for the Tenant and Sharon Y. Locatell for the Developer, and a third neutrally appointed umpire, Eli R. Mattioli (the "Umpire"). As part of the appointment procedure, the Umpire was required to make timely disclosures and was instructed that disclosure of any past or present relationship with the parties or their counsel, direct or indirect, was a continuing obligation throughout his service (see Exh. D, NYSCEF Doc. No. 28). At issue in the present proceeding is the Umpire's conduct or involvement with certain parties during the arbitration.
B. The Conflict of Interest and Recusal Dispute
The dispute over the validity of the arbitration initially began with a solicitation by the Landlord's primary counsel, Thomas Mealiffe, made during the pendency of the arbitration. Mr. Mealiffe offered Umpire Mattioli a paid position as an appraiser in an entirely unrelated [*3]appraisal proceeding (the "Durst engagement."), doing so by communicating directly with the Umpire and without notifying counsel for the Tenant that he was both speaking to the Umpire ex parte and offering him a paid employment opportunity. By itself, this action posed a significant ethical risk that the integrity of the arbitration could be called into question. This is particularly true given that the parties previously agreed that ex parte communications with the Umpire were prohibited.
Moreover, the Umpire's subsequent handling of the conflict was demonstrably imperfect. When the Umpire initially informed all the parties that he had been "invited" to serve in the unrelated Durst engagement, he neglected to disclose that he had communicate directly with the Developer's counsel regarding the engagement. In fact, he claimed that he had not had any ex parte communications with Mr. Mealiffe, a claim that was at best misleading if not outright false. That initial incomplete disclosure was made in an e-mail, dated May 16, 2025, addressed to counsel for the Landlord and the Tenant (see Exh. L, NYSCEF Doc. No. 36). The other notable omission in the May 16th e-mail was any attempt by the Umpire to seek permission or consent from the Tenant or to acknowledge any concerns the Tenant or its counsel might have. Instead, he self-proclaimed that the engagement would not create a conflict of interest on his part in relation to the arbitration.[FN3]

Tenant's counsel, Brett Dockwell, subsequently learned that Mr. Mealiffe had engaged in direct communications with the Umpire concerning the job offer, a fact which the Umpire had initially omitted from his disclosure. The Tenant requested that the Umpire recuse himself based on the appearance of partiality. On May 23, 2025, following the disclosure of the potential new engagement in the Durst appraisal proceeding, the Tenant formally petitioned the AAA to remove the Umpire. The Tenant believed petitioning AAA was the proper course of action for removal based on the materials provided by AAA when appointing the Umpire. The underlying reason for seeking the Umpire's removal was the conflict of interest and resulting appearance of partiality created because Landlord's counsel (Thomas Mealiffe) had personally contacted the Umpire and communicated a job offer during the arbitration. Tenant's counsel argued that having been offered work by Landlord's counsel outside of the arbitration, it would be entirely reasonable for the Umpire to be appreciative of the offer and to contemplate the possibility of future work, thereby denying the Tenant the assurance of absolute impartiality.
On May 27, 2025, the AAA responded, stating that it lacked the authority to take any such action (Exh. M, NYSCEF Doc. No. 37). Specifically, the AAA informed counsel that, "As this matter is closed with the AAA, we do not have the authority to rule on the objection of Mr. Mattioli." (Id.). The reason provided was that the Arbitration was being self-administered by the parties, not by the AAA (see Exh. M, NYSCEF Doc. No. 37). The Lease required the parties to seek appointment of an umpire from the AAA only because the two party-appointed arbitrators were unable to agree upon an umpire. The AAA's role was limited to the appointment of the [*4]umpire. In summary, the AAA's official response cited a lack of authority because the arbitration was self-administered, and its mandate was complete once Mattioli was appointed.
In order to conduct a thorough analysis of the petition and cross-motion, the Court ideally should carefully consider the issue of whether the arbitration was self-administered, as stated by the AAA, and whether the AAA was correct in stating that the arbitration was self-administered and that it therefor lacked authority to rule on the Tenant's objection to the Umpire's continued service because the matter was closed within the AAA. Unfortunately, the lack of full information in the record as to the specific reasoning utilized by the AAA in making that determination makes such analysis difficult. The arbitration was conducted pursuant to the arbitration provisions contained in Paragraph Nineteenth of the Lease, which specified that the arbitration would be conducted in accordance with Article 84 of the Civil Practice Act (the predecessor to CPLR Article 75). The Landlord asserts that the arbitration was clearly an ad hoc arbitration and was not conducted pursuant to the Rules of the AAA. The Lease required the parties to go to the AAA only if the two party-appointed arbitrators could not agree on an Umpire. The AAA's role was therefore limited to the appointment. Once the Umpire was appointed on February 28, 2025, the AAA considered its file closed. The Landlord's counsel agreed with this approach and argued that since this was an ad hoc arbitration, the AAA rules did not govern the proceedings. The Tenant disagreed and argued that petitioning the AAA was the proper course of action based on the materials the AAA had provided when it appointed the Umpire. The Notice of Appointment (Exh. D, NYSCEF Doc. No. 28), which the AAA sent to the parties and the Umpire (Eli R. Mattioli), explicitly stated that impartiality was "most important" and mandated disclosure of any relationship, direct or indirect, as a continuing obligation throughout your service on the case." This suggests that the Umpire was bound by AAA-promulgated guidelines regarding disclosure and impartiality.[FN4]

The nature of the arbitration (ad-hoc vs. administered) was important because it would be relevant to a determination as to whether the proper procedures were followed in deciding who had the authority to intervene in the conflict between the Umpire and the Tenant and what standards governed the Umpire's conduct, particularly in determining whether and/or on what basis he would need to recuse himself. The AAA's determination that the arbitration was self-administered meant that the AAA would not act on the Tenant's request for removal. This denial forced the Tenant to then ask the Umpire himself to recuse. The Umpire denied this request two days later. Had the AAA asserted jurisdiction, the recusal request would have been handled by the AAA's administrative process, and the Umpire would not have been involved in that decision.
In arguments before this Court, the Tenant's counsel reaffirmed that they believed petitioning the AAA was the proper course of action "based on the materials that the AAA had provided." (Dockwell Aff. ¶ 14, NYSCEF Doc. No. 24). They emphasize that the Umpire signed the AAA Notice of Appointment, which included the continuing disclosure obligation. The Landlord consistently argued that the arbitration was ad-hoc. Landlord's counsel used the [*5]AAA's May 27, 2025, letter (stating the matter was closed and they lacked authority) as primary evidence that the AAA was not the administrator. They asserted that the Lease mandated AAA involvement only for the Umpire's appointment. During oral argument, the Court asked, "Is that an issue in dispute, you say the AAA rules govern?" and counsel responded, "Yes, your Honor... The disclosure guidelines that Mr. Mattioli signed off on as part of his appointment to be an arbitrator in this case bind him" (October 9, 2025 Tr at page 15, NYSCEF Doc. No. 124). The Landlord's counsel subsequently reiterated, "this is an ad hoc arbitration... The AAA rules do not govern" (Id. at page 14 — 15).
On this limited record, the Court cannot fully determine whether it was appropriate to leave the recusal decision solely to the discretion of the Umpire without any input or guidance from the entity that appointed him. The Landlord argues that since the arbitration was ad hoc and not governed by AAA Rules, the recusal decision rested solely with the Umpire, who acted within his discretion by searching his own conscience, as judges typically do. The Landlord argues that the denial of recusal is not a basis for vacatur unless the Tenant proves, by clear and convincing evidence, that the Umpire's subsequent conduct demonstrated actual partiality or prejudice. The entire vacatur battle revolves around proving umpire partiality or misconduct. The Tenant relies on the Umpire's breach of the appearance of partiality standard, emphasizing that the Umpire was required to maintain complete impartiality because he was appointed as a neutral. By denying the Umpire was bound by AAA administration rules, the Landlord attempts to minimize the ethical breach and elevate the burden of proof required for vacatur to that under New York's CPLR 7511.
The self-administered nature of the arbitration as determined by the AAA becomes the jurisdictional trigger that channeled the Tenant's recusal motion away from an administering body and directly to the conflicted Umpire, contributing to the subsequent legal arguments regarding the fairness and integrity of the proceeding. In the opinion of the Court, it was very unfortunate that the AAA did not simply rule on the Tenant's recusal request based on its view and analysis of the applicable guidelines and obligations of a neutral arbitrator to avoid the appearance of impartiality. But unfortunate is not the same as wrong or improper. The Tenant has not proven that the determination by AAA to decline to rule on the Tenant's application was improper. The determination did fundamentally change the nature of the dispute resolution process in a manner clearly detrimental to the Tenant.
C. The Recusal Request and Bargain
Therefore, the denial by AAA then immediately required the Tenant to turn to the Umpire himself to seek recusal. The Tenant requested that the Umpire recuse himself to protect its right to a fair arbitration and based on the alleged appearance of partiality (see Exh. N, NYSCEF Doc. No. 38). The Umpire responded by offering what the Tenant characterized as a quid pro quo though the phrasing is conditional rather than just declarative. Essentially the Umpire suggested that if he declined the engagement in the Durst Proceeding, the recusal application could be withdrawn and the issue resolved (see Exh. O, NYSCEF Doc. No. 39). The Tenant rejected this offer. There is evidence, in the form of the Umpire's own statements in correspondence, that supports the Tenant's claim that the Umpire based his decision to both deny the recusal motion and decline the Durst engagement in accordance with instructions given to him by the Landlord's counsel's . Landlord's Counsel and the Umpire both acknowledge that the Landlord's Counsel asked the Umpire to deny the recusal motion and decline the Durst Engagement and the Umpire complied with this request. The Umpire's May 29, 2025, email [*6]denying the recusal motion stated: "I am denying the request for the reasons stated in [Landlord's] letter of today" (Exh. R, NYSCEF Doc. No. 42). This denial occurred after the Landlord's counsel, Stephen B. Meister, submitted a letter requesting that the Umpire deny the recusal request and stating that the Umpire should "resolve the matter by declining to serve in the new matter." (Exh. P, NYSCEF Doc. No. 40).
The Tenant argues that this action—the Umpire accepting the instruction from one party's counsel (Landlord) to decline the job after the opposing party (Tenant) had objected—did not cure the appearance of partiality. In fact, according to the Tenant, it exacerbated it. The Tenant characterized the Umpire's overall conduct—including initially attempting to bargain (offering to decline the job only if Tenant dropped the recusal request) and ultimately declining the job at the instruction of Landlord's counsel—as creating an "impossible dilemma" for the Tenant and demonstrating bias. The subsequent actions of the Umpire, such as reversing the agreed-upon procedure to allow the Landlord's late motion to strike, are cited by the Tenant as compounding the appearance of partiality created by the handling of the Durst engagement. 
D. Procedural Rulings and Further Allegations of Bias
Despite a purported prior agreement against prehearing briefing, the Landlord filed a prehearing motion on June 20, 2025, seeking to strike and preclude evidence and arguments from the Tenant's expert reports, arguing they violated the clear terms of the Lease (see Exh. S, NYSCEF Doc. No. 43). The Tenant alleges this motion sought to "cut the heart out of Tenant's case", which had been clear from the start (Respondent's Memorandum of Law, NYSCEF Doc. No. 63).
The Tenant alleges that despite alternative requests to prohibit briefing or for an adjournment, the Umpire instead gave them only two days to respond to this dispositive motion (Id.). On June 27, 2025, the Panel majority (Umpire Mattioli and Arbitrator Locatell) granted the motion (see Exh., X, NYSCEF Doc. No. 48). Upon learning that the Tenant planned to petition the Supreme Court for his removal and a stay, the Umpire reacted with "evident pique" according to the Tenant (see Memorandum of Law in Opposition to the Petition and in support of Cross-Motion, NYSCEF Doc. No. 63). The Tenant alleges the Umpire expedited the hearing schedule and issued the Final Award on July 18, 2025, before hearing transcripts were complete (Id.). The Final Award determined the fair market value of the land to be $301,250,000 (see Exh. 1, NYSCEF Doc. No. 2) and was unanimously signed by all three arbitrators, including the Tenant's appointee, Howard Raber (Id.). However, Mr. Raber later submitted an affirmation stating he signed the Final Award solely to mitigate the harm that would have resulted from an even higher valuation proposed by the majority (see Raber Aff., NYSCEF Doc. No. 61).
II. LEGAL ANALYSIS: STANDARD FOR VACATUR UNDER CPLR ARTICLE 75
This Court must confirm the Final Award unless the party seeking vacatur meets the high standard of establishing one of the grounds set forth under CPLR § 7511(b)(1) (see Am. Intl. Specialty Lines Ins. Co. v Allied Capital Corp., 35 NY3d 64, 70 [2020] ["CPLR article 75 codifies a limited role for the judiciary in arbitration . . . an application to vacate an arbitration award may be granted in narrow circumstances"]). "Consistent with the public policy in favor of arbitration, the grounds for vacating an arbitrator's award as set forth in CPLR 7511(b) are few in number and are narrowly applied" (Azrielant v Azrielant, 301 AD2d 269, 275 [1st Dept 2002] [internal quotations omitted]). The provision permits vacatur if a court finds that the rights of the party seeking vacatur were prejudiced by, as relevant to the underlying dispute here: "(i) corruption, fraud or misconduct in procuring the award; or (ii) partiality of an arbitrator [*7]appointed as a neutral."
The party seeking to set aside an award on any of the grounds under CPLR § 7511 has a heavy burden to meet (see Greenky v Aytes, 138 AD3d 460 [1st Dept 2016], citing Muriel Siebert & Co., Inc. v Ponmany, 190 AD2d 544, 544 [1st Dept 1993]). When a party seeks to vacate an award on the grounds of arbitrator misconduct or partiality, that party must prove the misconduct or partiality by clear and convincing evidence (see Moran v New York City Transit Authority, 45 AD3d 484, 485 [1st Dept 2007]; Allstate Ins. Co. v GEICO, 100 AD3d 878, 879 [2d Dept 2012]).
An award may be vacated on the ground of partiality by an arbitrator appointed as a neutral if an arbitrator fails to disclose information that would support an inference of bias in favor of one of the parties (see J.P. Stevens & Co., Inc. v Rytex Corp., 34 NY2d 123, 129-130 [1974]). A party seeking to set aside an arbitration award on the grounds of arbitrator bias must establish such bias by "clear and convincing proof, the mere inference of partiality is insufficient to interfere with the arbitration award" (Matter of Infosafe Systems, Inc. (Int'l Dev. Partners, Ltd.), 228 AD2d 272, 273 [1st Dept 1996]). 
It is important to note that under facts such as alleged here, there can be substantial overlap between these two grounds for vacatur. Misconduct by an arbitrator justifying vacatur can include circumstances wherein an arbitrator engages in ex parte communications with a party that gives the appearance of impropriety or the potential for bias (see Matter of Catalyst Waste-to-Energy Corp. of Long Beach (City of Long Beach), 164 AD2d 817, 820 [1st Dept 1990]). Such conduct may also make vacatur appropriate for partiality of an arbitrator.
A. The Disputed Standard: Appearance of Impropriety vs. Actual Prejudice.
The central legal dispute in this case concerns the type of proof required to establish partiality or misconduct under CPLR § 7511. More specifically, the central legal conflict between the parties is the requisite standard needed to satisfy CPLR § 7511(b)(1), i.e.: whether, as the Tenant asserts, the appearance of impropriety is sufficient or if, as the Landlord asserts, the aggrieved party must prove that its rights were prejudiced by the partiality, typically measured by clear and convincing evidence. Both positions are supported by New York caselaw and there is clear legal tension regarding the precise interpretation of the standard appliable under CPLR § 7511(b)(1)(ii).
The Tenant argues that under established First Department precedent, the appearance of impropriety or partiality is sufficient to warrant vacatur of an award. The Tenant asserts that for a neutral arbitrator, merely demonstrating the potential for bias is sufficient to find misconduct. This position relies on caselaw holding that because arbitration awards are entitled to extreme judicial deference and therefore there is a reluctance to disturb the substance of awards, the integrity of the process must always be "zealously safeguarded." (Matter of Goldfinger v Lisker, 68 NY2d 225, 231 [1986]). Tenant argues that even in the absence of any indications of prejudice, if the actions of an arbitrator give the appearance of impropriety or the potential for bias, vacatur is warranted (see Matter of Catalyst, 164 AD2d at 820 [vacating award where "[n]otwithstanding petitioner's assertion that there is no indication of prejudice, the actions of the arbitrators herein give the appearance of impropriety."]). The basic fundamental principles of justice require complete impartiality on the part of the arbitrator and mandate that the proceedings be conducted without an appearance of impropriety (see Matter of Fischer [Queens Tel. Secretary], 106 AD2d 314, 315-316 [Kassal, J. concurring] [1st Dept 1984]). Consequently, it is incumbent upon an arbitrator to fully disclose any relationship which raises even a [*8]suggestion of possible bias (Matter of Weinritt (Carp), 32 NY2d 190, 201 [1973]).
The case of Matter of Catalyst Waste is clearly a strong one for the Tenant. The relevant similarities are centered on the nature of the financial influence exerted on the neutral arbitrator and the relevant legal standard asserted as grounds for vacatur. In both cases, the party aggrieved by the arbitration argues, successfully in the case of Catalyst Waste, that an arbitration award can be vacated based on the appearance of impropriety or potential for bias by the arbitrator, even without a showing of actual prejudice. Both cases also involve actions concerning the arbitrator's potential compensation that occurred during the pendency of the arbitration and lead to claims of misconduct. In the current case, the concern is that the neutral Umpire, Mr. Mattioli, was offered a new, separate paying job by counsel for Landlord (Petitioner) while the arbitration was pending. This alleged financial inducement allegedly tainted everything that came after it and created an appearance of partiality. In Catalyst Waste, the arbitrators sought an increase in their daily fees for the hearings that were currently in progress. Both situations are cited as compromising the integrity of the arbitration process, justifying vacatur of the award even without a showing of prejudice.[FN5]

The other case relied upon by the Tenant is Matter of Kern (303 E. 57th St. Corp-Excelsior 57th St., 204 AD2d 152 [1st Dept 1994]. Kern dealt with a neutral arbitrator involved in a ground-lease rent dispute who was contacted by a non-party seeking his services on an unrelated matter. The non-party contacted the arbitrator because of a referral from counsel for one of the parties to the ongoing arbitration. The umpire in Matter of Kern did not disclose this communication to the parties at any time prior to the issuance of the panel's final determination (see Kern, 204 AD2d at 153). The Appellate Division unanimously reversed the lower court's confirmation of the award and vacated the arbitration award, finding that the failure of the umpire to disclose the existence and nature of the communication raised, under the particular circumstances, "a question of possible bias or partiality" and an "appearance of impropriety." (Id.). The Court concluded that because the umpire's name was referred by the petitioners' [*9]attorney well before deliberations began, the "integrity of the process appears to have been compromised." (Id.).
The Tenant argues that the Kern Court established that prejudice to the movant was inherent in the act of referral, as such an act would naturally curry favor with the umpire, thereby denying the opposing party (the Tenant) the assurance of complete impartiality. The Tenant contends that the impropriety in this case is even worse than in Matter of Kern, because here, the solicitation was direct from Developer's counsel rather than the indirect referral through a third party as occurred in Matter of Kern. The Tenant contends that the appearance of partiality is, in itself, sufficient prejudice if not per se prejudicial. The argument is that once an umpire engages in misconduct, such as seeking payment from counsel for one side during the arbitration, this fundamentally compromises the integrity of the proceeding, thereby denying the party's right to a fair hearing.[FN6]

However, the Landlord correctly emphasizes that the authority of the Court to vacate an award is carefully circumscribed by the statute and CPLR § 7511 explicitly requires that the party's rights must be prejudiced by the partiality or misconduct. As stated above, the party seeking to vacate an arbitration award bears a heavy burden of proof (see Matter of U.S. Elecs., Inc. v Sirius Satellite Radio, Inc., 17 NY3d 912, 915 [2011]), and this burden is not met by mere speculation, conjecture, or the appearance of impropriety. Rather, the moving party must establish its grounds for vacatur by clear and convincing evidence (see Paluch v Kohn, 204 AD3d 804, 806 [2d Dept 2022]; Intrepid Investments, LLC v Selling Source, LLC, 159 AD3d 508, 509 [1st Dept 2018]).
The decision cited by the Landlord in U.S. Elecs., Inc. v. Sirius Satellite Radio, Inc., 17 NY3d 912 (2011), is highly relevant to this dispute and persuasive even if one assumes, as the parties have, that CPLR Article 75 governs this dispute present arbitration, rather than the Federal Arbitration Act (FAA). This is because it articulates and refines the definition and requirements of the New York standard for vacating an arbitration award due to arbitrator partiality or misconduct. The Appellate Division, while noting that the federal statute controlled, found that "petitioner failed to meet its burden of proving by clear and convincing evidence that any impropriety or misconduct of the arbitrator prejudiced its rights or the integrity of the [*10]arbitration process or award, since no proof was offered of actual bias or even the appearance of bias." (U.S. Elecs., Inc. v Sirius Satellite Radio, Inc., 73 AD3d 497, 498-99 [1st Dept 2010], affd, 17 NY3d 912 [2011]).
The Court of Appeals, in its review of the Appellate Division's decision, adopted the federal standard and found that consequently, the Appellate Division erred by imposing this above burden upon the party seeking vacatur as "[n]o such standard can be gleaned from federal precedent." (U.S. Elecs., 17 NY3d at 914). This view suggests that the New York standard is higher than the federal standard because of the prejudice requirement. The Landlord relies on this articulation as confirmation of the New York prejudice-based standard, asserting that the burden under CPLR 7511(b)(1) is establishing prejudice by clear and convincing evidence, and arguing in its brief that it is the "controlling standard, which sinks Respondents' case." If this higher standard applies, the Landlord claims victory on the grounds that the Tenant suffered no actual harm or prejudice because the key ruling complained of (the preclusion order striking Tenant's appraisal theory) was compelled by the terms of the Lease and therefore was merit-based, not bias-driven.
The Tenant acknowledges that the CPLR statutory text links vacatur to a showing of prejudice. However, they argue that the petitioner is attempting to distort the Court of Appeals ruling in U.S. Elecs. to use it as precedent supporting their position in this dispute. They contend that the traditional still binding New York appellate authority cited and discussed above establishes a different and lower threshold — that the appearance of impropriety or partiality is sufficient to warrant vacatur of an award. Under this older, traditional view, the appearance of partiality is considered per se prejudicial, meaning the prejudice is inherent in the impropriety itself, and proving actual prejudice is unnecessary. Thus, U.S. Elecs. is relevant because the parties are debating whether the traditional appearance of impropriety standard (which implies prejudice) still holds sway, or whether the explicit articulation of the CPLR standard within the U.S. Elecs. opinion requires a separate, specific, clear and convincing demonstration of how the misconduct prejudiced the party's rights. 
The Court agrees with the Landlord that, despite some significant caselaw to the contrary, under New York law, vacatur is warranted only upon a showing of actual prejudice or harm resulting from the alleged misconduct. As noted above, the statutory text of CPLR § 7511 explicitly demands a showing of prejudice or actual harm resulting from impropriety. Perhaps contrary to its decisions in Catalyst-Waste and Kern, the First Department has held that the mere inference of impartiality is not enough to justify interfering with an arbitrator's award (see Rose v J.J. Lowery & Co., 181 AD2d 418, 419 [1st Dept 1992]; Matter of Provenzano v Motor Vehicle Acc. Indemnification Corp., 28 AD2d 528 [1st Dept 1967]; Matter of Infosafe Sys., Inc. (Intl. Dev. Partners, Ltd.), 228 AD2d 272, 272 [1st Dept 1996]). Given the statutory predicate requiring a showing of prejudice and the heavy burden imposed on a party seeking to vacate an arbitration award on the basis of misconduct and/or impartiality, it is reasonable to assume that the mere inference of partiality is not sufficient to warrant interference with an arbitrator's award (see Matter of Infosafe Sys., 228 AD2d at 272-273; Rose v Lowery, 181 AD2d at 419). The misconduct must have been of such a character as to have deprived the party of a fair hearing.
The Tenant dismisses the Landlord's arguments concerning the precedential value of U.S Elecs and suggests that if the Court of Appeals intended to completely abolish the long-standing appearance of impropriety standard for CPLR cases, it would have done so clearly in a CPLR context, not indirectly in an FAA memorandum opinion. But this ignores both the complex [*11]procedural context in that case and the other caselaw citied by the Landlord in support of their position and unduly minimizes the heavy burden that must be met to justify court interference with an arbitration award. While New York courts have traditionally placed a high value on the appearance of impartiality, especially concerning fee and/or financial relationships between an arbitrator and counsel, the ultimate statutory prerequisite for vacatur under CPLR§ 7511(b)(1) remains a showing of prejudice. 
Landlord also relies on the recent decision in Matter of Cuomo v JAMS, 2025 WL 2832051 (1st Dept 2025). In that case, an arbitrator allegedly failed to disclose that during his prior employment with a law firm, he handled several matters on behalf of one of the parties to the arbitration. The petitioner in that action sought to stay the pending arbitration and disqualify the arbitrator, which was denied by the Supreme Court and the denial was appealed to the First Department. In affirming the denial, the Appellate Division held that an arbitrator may not be disqualified solely because of his relationship to a party, but rather, upon facts demonstrating partiality to a litigant (Matter of Cuomo, 2025 WL *1). There was no claim of any misconduct on the part of the arbitrator, and no facts pled that would indicate that the arbitrator was biased in his handling of the arbitration for nearly a year (Id.). While by no means fully on point, the Cuomo decision reinforces the Landlord's view that the mere appearance of partiality standard is insufficient and proof of actions demonstrating bias or partiality which prejudice an arbitrating party's rights is required. However, it is important to note that the factual improprieties here, including the Umpire being encouraged to accept a paid job offer from the Landlord's counsel, are significantly more egregious than the distant, disclosed, and non-financial conflicts at issue in Cuomo. 
Accordingly, in order to prevail on the cross-motion to vacate the Final Award, the Tenant must establish, by clear and convincing evidence, that the Umpire's conduct prejudiced its rights in the arbitration.
B. Application of the Correct Standard to the Facts
The conduct of both the Umpire and the counsel for the Landlord was improper and created a severe appearance of partiality, but the Tenant has failed to meet its heavy burden of demonstrating by clear and convincing evidence that the improprieties or the subsequent procedural rulings, prejudiced its rights in the arbitration.
The direct solicitation of the Umpire for a paid position by the Landlord's counsel during the pendency of the arbitration, and the Umpire's initial misleading disclosures and subsequent attempts to condition his declination on the Tenant withdrawing the recusal motion, clearly compromised the integrity of the process and mandates strict scrutiny. The Tenant argues that this situation is comparable to or even more egregious than the circumstances requiring vacatur in Kern or Catalyst-Waste. However, the situation differs in one crucial respect. While the Umpire's initial disclosures were incomplete and arguably misleading, ultimately the Umpire did provide full details about the job offer from the Landlord's counsel prior to the commencement of the arbitration hearings. This distinguishes this situation from precedents such as Kern where an undisclosed or accepted relationship was left to taint the final determination.
Moreover, the Tenant has failed to demonstrate or show any objective facts that would link any impartiality to the Final Award. While the Umpire's initial attempt to bargain with the Tenant was ill-advised and questionable, particularly since it came at the suggestion of the Landlord's counsel, the record does not establish that the conflict resulted in financial motivations or actual prejudice affecting the final valuation, particularly given the unanimous [*12]nature of the award.
The Tenant argues that the panel's decision to allow the preclusion motion and grant the Tenant only two days to respond constituted misconduct and a denial of due process. The motion to strike was granted because the panel determined that the Tenant's valuation reports contravened the unequivocal text of Lease, requiring valuation to be calculated as "vacant, unimproved and free of the Lease." The Landlord correctly argues that the stricken reports sought to rely on irrelevant expert opinions and testimony and violated the established appraisal protocols. The language of the Lease regarding the method that should be utilized to determine the value of the land is clear and unambiguous. Contrary to the arguments put forth by the Tenant, the decision of the panel was not cursory, and the panel explained its reasoning for granting the motion to strike in sufficient detail. Even if this Court were to disagree with the panel's decision on the admissibility of evidence, which this Court is not empowered to do, a challenge to a ruling that is objectively based on an interpretation and application of language in the governing lease is not a ground for vacatur of an award (see Metro. Transportation Auth. v Westfield Fulton Ctr., LLC, 228 AD3d 435, 436 [1st Dept 2024], lv to appeal denied, 43 NY3d 907 [2025] ["a court is bound by the arbitrator's factual findings and interpretations of the contract"]; Maross Const., Inc. v Cent. New York Regional Transp. Auth., 66 NY2d 341, 346 [1985] ["an arbitrator's interpretation of the parties' contract is impervious to judicial challenge even where 'the apparent, or even the plain meaning of the words' of the contract has been disregarded]).
The truncated briefing schedule raises a serious procedural concern but there has been no showing that the denial of the Tenant's request for an adjournment was made in bad faith or was patently unreasonable, particularly given the already lengthy delays that had occurred. Even if the rushed schedule was improper, the Tenant must still prove that the error prejudiced its rights. The Tenant has failed to prove such prejudice given the clear language in the lease. Furthermore, even if the panel erred in granting the motion to strike and or preclude the Tenant's evidence, the general limitation on judicial review of arbitration awards would preclude this Court from disturbing the decision unless the resulting Final Award is irrational, violates a strong public policy or clearly exceeded a specifically enumerated limitation on the arbitration panel's power (see Matter of Falzone [New York Cent. Mut. Fire Ins. Co.], 15 NY3d 530, 534[2010]).
While the affirmation of retired Justice Acosta is valuable and helpful in highlighting the possible ethical breaches committed by the Umpire and the Landlord's counsel, it ultimately does not carry the day because the Tenant still has to demonstrate prejudice under the stringent standards of CPLR Article 75. Justice Acosta's opinion provides a thorough analysis of how the appearance of partiality may mandate recusal under professional guidelines and AAA standards, yet it does not and cannot offer evidence of actual harm or prejudice to the Tenant's rights regarding the final valuation. While his affirmation may serve to raise a clear inference or appearance of bias, Justice Acosta does not and cannot establish that the alleged misconduct fundamentally affected the outcome of the proceeding. Because the Umpire's procedural rulings were objectively grounded in a merit-based interpretation of the governing Lease, the record lacks the direct, definite, and capable demonstration of actual harm required to overcome the heavy burden of proof, regardless of the very valid ethical concerns raised by Justice Acosta.
Most significantly, the Tenant's claim of prejudice is refuted both by the unanimous Final Award and the actions of the Tenant's own party-arbitrator, Mr. Raber. Mr. Raber signed the [*13]Final Award and subsequently submitted an affirmation (Raber Aff., NYSCEF Doc. No. 61) claiming that he signed the award solely to mitigate the harm done by the misconduct of the Umpire. He claims that had he not agreed to sign the Final Award making it unanimous, the Umpire and the Landlord's appointed arbitrator would have agreed to an even higher valuation. Mr. Raber had previously refused to sign the order granting the Landlord's motion because he believed it would deny the Tenant its right to be heard and would substantially modify the agreed-upon arbitration procedure, thus materially prejudicing the Tenant in presenting its case. His signing of the Final Award included an express statement that his signing of the Final Award did not mean he was withdrawing his objections to the exclusion from consideration of what he viewed as material evidence in support of the Tenant's case.
Whatever his reasons may have been, in signing the Final Award, Mr. Raber committed himself and the Tenant to a path where retreat is not possible. Mr. Raber indicated that by signing the Award he was not implying any change to his dissent from the panel's granting of the Landlord's motion to preclude but he did not indicate in any manner that he was also in disagreement with the valuation figure that the panel awarded. He cannot be heard to impeach the Award now. Well-established law holds that an arbitrator may not be heard to impeach his own award (see Matter of Martin Weiner Co. (Freud Co), 2 AD2d 341, 343 [1st Dept 1956], affd, 3 NY2d 806 [1957] ["If an arbitrator may not be questioned as to the reasons underlying an award to impeach it, then by the same token he cannot be heard to impeach it upon the ground that it does not reflect his intention. To hold otherwise could easily destroy the finality attendant upon an arbitration award and subject it to the arbitrator's whim, caprice or change of heart. The award would then become the commencement, not the end of litigation . . . "]; see also Matter of Big-W Const. Corp.(Horowitz), 24 Misc 2d 145, 156, [Sup Ct, Queens Cty 1959], aff'd, 14 AD2d 817 [2d Dept 1961] ["The practice of interviewing arbitrators after an award has been made in an effort to find out what motivated it, and if possible, to find out from their reasoning a flaw upon which to base an attack upon their award, is to be deplored both as an unwholesome practice and because the results of such endeavors have no efficacy as a matter of law. Our public policy, as enunciated by decisional law, has made it manifest time and again that arbitrators, jurors or other persons sitting in similar capacities, may not by their own statements made after their determination, impeach it"]).
Mr. Raber's actions are no different than that of a juror who signs on to a unanimous verdict after a trial and later tries to discredit or impeach the verdict. Allowing an arbitrator to impeach or discredit his own award after the fact opens up Pandora's Box. It destroys the finality of the Award, the very aspect that makes arbitration valuable and efficient, and subjects it to the arbitrator's individual willingness to change his or her position without warning or justification. Mr. Raber's effort to disavow his signature is an improper impeachment of the award he signed. It is also insufficient to demonstrate prejudice to the Tenant. Mr. Raber affirmed that he signed the Final Award solely to mitigate the harm to the Tenant from what he believed was an overstated valuation, concerned that if he dissented, the other two arbitrators would conclude to an even higher valuation. Mr. Raber explicitly included a statement in the Final Award preserving his dissent from the Panel's order granting the motion to strike documents and preclude related testimony but did not offer anything to challenge the higher valuation. Mr. Raber's subsequent affidavit constitutes an impermissible attempt by an arbitrator to impeach his own award. His stated rationale—signing to "mitigate harm" and prevent a worse outcome—is a textbook description of strategic compromise during deliberations. Such [*14]deliberative give-and-take is not a flaw in the arbitral process; it is an inherent and anticipated feature of tripartite panels, particularly those with party-appointed arbitrators, ensuring all viewpoints are robustly considered.
Mr. Raber's full participation and ultimate assent to the Award conclusively demonstrate that the Tenant's position was fully represented and fairly considered by the Panel. Whatever the procedural infirmities in the arbitration may have been, the Tenant has not met its burden to prove that this Court would be justified in usurping the will of the arbitrators and overturning the Final Award.
CONCLUSION
For the reasons set forth hereinabove, it is hereby
ORDERED and ADJUDGED that the respondents' cross-motion to vacate the arbitration award is denied; and it is further
ORDERED and ADJUDGED that the petition is granted and the award rendered in favor of petitioner and against respondents is confirmed.
This constitutes the decision, order, and judgment of the court.
DATE 1/5/2026NICHOLAS W. MOYNE, J.S.C.

Footnotes

Footnote 1:The original Lease and First Amendment of Lease (NYSCEF Doc. Nos. 3 and 4) set the rent upon renewal at "5% of the then appraised value of the land which is subject to the renewal lease at the commencement of the term thereof, considered as unimproved and exclusive of any buildings or improvements thereon." The "considered as if vacant, unimproved, and free of the Lease" language first appeared in the Second Amendment of Lease dated March 15, 1974 (NYSCEF Doc. No. 5) and was carried over onto the subsequent Lease Amendments (NYSCEF Doc. Nos. 6, 7, and 8).

Footnote 2:At oral argument, it was suggested that the arbitration and this resulting dispute might be governed by the Federal Arbitration Act (FAA)because of the impact that it would have on interstate commerce. Nevertheless, the parties have briefed and argued the issues under the assumption that CPLR Article 75 governs this dispute. The Court will allow the parties to chart their own course in this litigation.

Footnote 3:The entire disclosure reads:

I've been invited to act as the neutral umpire in an entirely unrelated appraisal proceeding. While the engagement will not create a conflict of interest on my part in relation to this arbitration, I am disclosing the engagement since Messrs. Gilbert and Mealiffe represent one of the parties involved in the matter. As in this case, I have not had, nor will I have or be permitted to have, any ex parte communications with counsel in the appraisal proceeding.

Footnote 4:Tenant's counsel noted that in another, similar conflict earlier that year, the Umpire was removed from a panel upon a party's objection to the AAA because that arbitration was administered by the AAA. This contrasts sharply with the AAA's stance in this case, highlighting the difference administrative status makes.

Footnote 5:There is little doubt that there is a long line of cases in New York holding that an arbitrator requesting or demanding additional compensation for the pending arbitration itself is generally impermissible because it creates an appearance of impropriety and potential bias. This is especially true when the request is conveyed prior to the completion of evidentiary hearings (see Matter of Fisher, 106 Ad2d at 316). The Tenant seeks to extend that general prohibition to cases where the arbitrator seeks permission to obtain additional compensation from a party involved in the arbitration for future services to be performed in connection with an unrelated matter involving that same party. While perhaps not as direct of a conflict, the instant situation still arguably placed the Tenant in a position where it may well have felt compelled to accede to the demands of the arbitrator for fear of adverse consequence or, alternatively, put the arbitrator in a position where he might have felt beholden to the Developer's counsel for offering him the opportunity to receive significant compensation in the unrelated matter. Courts should protect the parties from being placed in a position where they feel compelled to accede to the demands of the arbitrators concerning compensation matters for fear of adverse consequences including bias against them (see Matter of Double-M Constr. Corp. v Central School Dist. No. 1, Town of Highlands, 61 AD2d 442 [2d Dept 1978]); see also Grendi v LNL Const. Management Corp., 175 AD2d 775, 777 [1st Dept 1991]).

Footnote 6:There are numerous other examples in the First Department of cases holding that vacatur is proper even in the absence of a showing of actual prejudice or harm (see e.g. Velez Org. v. J.C. Contr. Corp., 289 AD2d 105 [1st Dept 2001] [finding that an undisclosed, but unrelated, bribery conviction of an arbitrator "placed serious doubt on his ability to act impartially and fairly . . . .[S]uch conduct tainted the integrity of the arbitration process and created an appearance of impropriety"]; Ament v. Schubert Piano Co., 172 AD.423, 425 [1st Dept 1916] [finding it improper for a referee to demand, mid-hearing, security for fees because although "it may be that the referee was not influenced by the refusal, others may not fairly doubt it"]). In Excelsior 57th Corp. v Kern, 218 AD2d 528 [1st Dept 1995], the Court found sufficient cause to intercede and to disqualify an arbitrator, who had expressed an opinion about the matter before the arbitration in a prior proceeding, on the grounds that "a real possibility that injustice will result [if the hearings continued with the arbitrator in place]" and that "this Court was concerned with the appearance of impropriety on the part of the 'umpire' and not actual prejudice" (Id. at 530, 630 N.Y.S.2d 492).